The **PEOPLE** of the State of Colorado, Plaintiff–Appellee,

v.

**Michael John PATNODE,** Defendant–Appellant.

No. 03CA1072.

Colorado Court of Appeals, Div. IV.

Aug. 11, 2005.

Certiorari Denied Jan. 9, 2006.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2004.

John W. Suthers, Attorney General, John D. Seidel, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Neff Services, Inc., Lauretta A. Martin Neff, Grand Junction, Colorado, for Defendant–Appellant.

Opinion by: Judge ROY.

Defendant, Michael John Patnode, appeals from the judgment of conviction entered on a jury verdict finding him guilty of one count of possession of a schedule II controlled substance (methamphetamine) with intent to distribute and one count of resisting arrest. He also appeals his sentence as a habitual offender. We affirm the conviction, vacate the sentence, and remand for further sentencing proceedings.

On December 6, 2001, the Larimer County Drug Task Force was conducting surveillance of defendant and defendant's friend at the friend's home. After the Task Force observed several vehicles stop briefly at the home in a thirty-five minute period, defendant and his friend left the home in defendant's 1975 Corvette.

Pursuant to a prior arrangement, the Task Force had two Fort Collins traffic patrol officers follow the Corvette in two marked patrol cars with instructions to pull the Corvette over if they observed any traffic infractions and perfect an arrest if possible. The arresting officer observed defendant speeding and changing lanes without signaling.

On this basis, he pulled the Corvette over and made contact with defendant and the friend. The assisting officer arrived shortly thereafter.

After stopping the Corvette, the arresting officer asked defendant to produce his license, vehicle registration, and proof of insurance. Defendant, who was angry, nervous, and belligerent, was unable to produce the registration or correct proof of insurance for the Corvette. The arresting officer then asked defendant to step out of the car and, after conducting a protective pat-down of defendant's clothing, arrested defendant for his failure to provide correct proof of insurance, an arrestable offense.

The two traffic officers then attempted to place defendant in the back seat of the patrol vehicle. Defendant lunged at one of the officers and then had to be forcibly placed in the patrol vehicle.

The assisting officer then conducted a search of the passenger compartment of the Corvette. The officer found a black fanny pack in the center console of the front seat, which pack, in turn, contained several baggies that appeared to contain methamphetamine, a glass pipe, another pipe wrapped in plastic bubble wrap, and a small digital scale. A subsequent inventory search of the vehicle produced a cigarette package containing what appeared to be more methamphetamine and a record of drug transactions, both found elsewhere in the passenger compartment.

At the police station, the arresting officer advised defendant, both orally and with a consent form, of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant refused to sign the consent form and stated that he would "never" waive his rights. At the same time, however, he asked the arresting officer whether he could speak to him "man to man."

In the ensuing conversation, defendant stated that he wanted to turn his life around. When the officer mentioned that working with the Task Force could be an option for him, defendant interrupted the officer and said, "I like what I do. I'm good at what I do." After the officer asked him what that

meant, defendant stated, "Come on, let's not insult each other's intelligence."

At this point, a detective with the Task Force entered the room with the evidence of the drugs gathered from the inventory search of the Corvette and advised defendant of the charges that would be filed against him. To this, defendant responded, "You think this is big time. This ain't shit." The detective then asked defendant whether he was willing to provide them any information, and defendant responded that if he were released with his drugs in his possession that night, he would call the police occasionally with information on certain persons he felt needed to be off the streets. The detective then started to leave the booking area, and defendant said, "And I want my shit back." When the detective asked him whether he was referring to the drugs discovered in the Corvette, defendant responded that he was.

Defendant was charged with one count of possession of a schedule II controlled substance with intent to distribute, in violation of § 18–18–405(1)(a), (2)(a)(I)(A), C.R.S.2004, a class three felony, and one count of resisting arrest, in violation of § 18–8–103, C.R.S.2004, a class two misdemeanor. Prior to trial, defendant filed several pro se motions challenging the traffic stop, his arrest, and the search of the Corvette. Following an evidentiary hearing at which defendant appeared pro se, the trial court determined that the traffic stop, arrest, and searches were lawful. The court further found that defendant's statements to the police were made knowingly and voluntarily and were thus properly admissible.

After the court appointed alternate defense counsel to represent defendant, defendant through counsel filed renewed motions challenging the traffic stop and his arrest and seeking suppression of the drug evidence and statements. Following a second hearing, the court denied these motions as well.

Defendant was convicted by a jury of the charged offenses. The court then adjudicated him a habitual offender on the basis of three prior convictions pursuant to § 18–1.3–801(2), C.R.S.2004 (formerly codified as § 16–13–101). At defendant's request, the court conducted an abbreviated proportional-

ity review, following which the trial court sentenced defendant to fifty-five years in the Department of Corrections on the possession of a controlled substance charge, nine years less than the prescribed sixty-four years. The court also imposed a one-year concurrent sentence for resisting arrest. This appeal followed.

## I.

Defendant first contends that the trial court erred in denying his motions to suppress the evidence found in the Corvette and the statements he made to the officers at the police station because the drug evidence was the product of an illegal search and seizure and the statements were elicited in violation of his rights under *Miranda v. Arizona, supra.* We disagree.

■ In reviewing a suppression order, we defer to the trial court's findings of fact, which will not be overturned if supported by competent evidence in the record. However, we apply a de novo standard of review to ascertain whether the trial court's legal conclusions are supported by sufficient evidence and whether it has applied the correct legal standard. *People v. Cruse,* 58 P.3d 1114 (Colo.App.2002).

### A.

Relying principally on *Amador–Gonzalez v. United States,* 391 F.2d 308 (5th Cir.1968); *People v. Hauseman,* 900 P.2d 74 (Colo. 1995); *People v. Corpany,* 859 P.2d 865 (Colo.1993); and *State v. Hoven,* 269 N.W.2d 849 (Minn.1978), defendant argues that his traffic stop and arrest were only a pretext to permit officers to conduct what would otherwise be an illegal search of his vehicle. We are not persuaded.

■ Under the Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution, warrantless searches are per se unreasonable unless they fall under a specifically established and well-delineated exception to the warrant requirement. *People v. Savedra,* 907 P.2d 596 (Colo.1995).

■ One such established exception is a search conducted incident to a lawful arrest. *People v. Kirk,* 103 P.3d 918 (Colo.2005). Under this exception, the scope of the search is generally limited to the person of the arrestee and the area within the arrestee's immediate control. *People v. H.J.,* 931 P.2d 1177 (Colo.1997). However, when the search is incident to the lawful arrest of an occupant of a vehicle, it may be extended to include the entire interior of the passenger compartment of the vehicle and the contents of any containers found within the passenger compartment, whether open or closed. *See New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *People v. H.J., supra.*

■ Here, the traffic officers pulled defendant over after observing him commit several traffic violations. After being pulled over, defendant failed to produce vehicle registration or proof of insurance. In failing to produce the required insurance card, defendant committed a class one misdemeanor traffic offense for which arrest is authorized. *See* §§ 42–4–1409(4)(a), 42–4–1705, C.R.S. 2004; *People v. Barrientos,* 956 P.2d 634 (Colo.App.1997). Thus, because defendant was lawfully arrested, the resultant search of the vehicle incident to that arrest was authorized and proper as well. As our supreme court has stated, "The Fourth Amendment to the United States Constitution does not prohibit police from effecting a full custodial arrest and conducting a search incident thereto for misdemeanors and petty criminal offenses perpetrated in an officer's presence." *People v. Triantos,* 55 P.3d 131, 133 (Colo.2002).

Furthermore, it is undisputed that the assisting officer conducted the search of the passenger compartment of the Corvette incident to defendant's arrest. Therefore, defendant has no basis for his claim that the officers' search of the fanny pack's interior exceeded the scope of a protective weapons search.

Nevertheless, defendant argues that, even if the search was conducted incident to his arrest, under our supreme court's decisions in *People v. Valdez,* 182 Colo. 80, 511 P.2d 472 (1973), and *Cowdin v. People,* 176 Colo. 466, 491 P.2d 569 (1971), his arrest for a minor traffic violation did not authorize a search for instrumentalities or evidence of crimes unrelated to the specific crime on which his arrest was based.

This argument is unavailing, however, because following the United States Supreme Court's decisions in *New York v. Belton, supra,* and *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), our supreme court specifically noted that *Cowdin* and *Valdez* are no longer controlling precedent with respect to motor vehicle searches incident to lawful custodial arrests. *See People v. Bland,* 884 P.2d 312 (Colo. 1994); *People v. Bischofberger,* 724 P.2d 660 (Colo.1986). Thus, we perceive no impropriety in the officer's search of the Corvette incident to defendant's lawful custodial arrest here.

■ Nor are we persuaded to reach a different result because this was a pretextual stop and arrest, as is apparent from the testimony of the police officers involved. It is well established that "otherwise lawful conduct by law enforcement officers is not made illegal or unconstitutional merely because the officers' subjective intent is illegitimate." *People v. Altman,* 938 P.2d 142, 146 (Colo.1997)(citing *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). Thus, in assessing a claim of an illegal search resulting from an alleged pretextual arrest, the subjective intent of the officers conducting the search is not relevant to the inquiry. The proper test is "whether the purpose of the search was objectively reasonable in light of the circumstances confronting the [officers] at the time of the search." *People v. Altman, supra,* 938 P.2d at 146.

Because we have concluded the actions of the traffic officers in this instance were objectively reasonable and proper, the resulting search of the passenger compartment incident to the arrest of defendant did not violate any of his Fourth Amendment rights.

### B.

Another established exception to the warrant requirement permits administrative and inventory searches. Here, the cigarette

package containing methamphetamine and the business record were found in the passenger compartment during an inventory search conducted prior to placing the Corvette in a police impound facility.

■ An officer who has validly taken a vehicle into custody may conduct an inventory search of the contents of the vehicle. *See Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *People v. Litchfield*, 918 P.2d 1099 (Colo.1996). Inventory searches are intended to protect the owner's property and to protect the police from future claims concerning lost or damaged property and from dangerous instrumentalities. *Colorado v. Bertine, supra.* While inventory searches may further a valid administrative purpose, administrative searches are typically conducted by administrative or law enforcement agencies inspecting a regulated business or activity. *See, e.g., New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). Inventory searches are not to be used as "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990).

■ The validity of inventory searches does not turn on the subjective intent of the officer in stopping or arresting a defendant, or on whether the arrest was otherwise pretextual. Instead, it turns on whether the search is authorized by the policy of the law enforcement agency involved.

In *Whren v. United States, supra,* the defendant was stopped by plainclothes narcotics detectives for a traffic infraction in a high crime area after his vehicle had remained stopped at a stop sign for a prolonged period, abruptly turned without signaling, and sped away at a high rate of speed. Upon approaching the defendant's vehicle, the detectives saw bags of cocaine in the defendant's hands. The defendant argued that the stop was pretextual because plainclothes narcotics detectives do not make routine traffic stops and the stop was intended to afford the detectives an opportunity to search his automobile.

The defendant urged that the probable cause to effect a traffic stop should not be sufficient for a search because traffic is so highly regulated that an officer with ulterior motives can almost always find a basis for making a traffic stop after only brief observation. Thus, traffic stops are a tempting pretext to investigate other suspected violations for which there is no probable cause or articulable suspicion.

The defendant therefore urged the Court to apply the principles set out in *Florida v. Wells, supra; New York v. Burger, supra;* and *Colorado v. Bertine, supra,* which held that inventory and administrative searches cannot be used as a ruse or pretext for obtaining evidence. In response to this argument the Court stated:

But only an undiscerning reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred. In each case we were addressing the validity of a search conducted in the *absence* of probable cause.

*Whren v. United States, supra,* 517 U.S. at 811, 116 S.Ct. at 1773.

The Court then briefly discussed *Colorado v. Bannister*, 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980)(per curiam), in which it upheld the admission of evidence, seized on the basis of its being in plain view after a traffic stop, which led to the arrest of the defendant for charges unrelated to the traffic stop. In a footnote, the *Bannister* Court stated, in part: "There was no evidence whatsoever that the officer's presence to issue a traffic citation was a pretext to confirm any other previous suspicion about the occupants." *Colorado v. Bannister, supra,* 449 U.S. at 4 n. 4, 101 S.Ct. at 44.

The *Whren* Court then ended its discussion of *Bannister* by stating:

It would ... be anomalous, to say the least, to treat a statement in a footnote in the *per curiam Bannister* opinion as indicating a reversal of our prior law. Petitioners' difficulty is not simply a lack of affirmative support for their position. *Not only have we never held, outside the context of inventory search or administrative inspection (discussed above), that an offi-*

cer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary.

*Whren v. United States, supra,* 517 U.S. at 812, 116 S.Ct. at 1774 (emphasis added).

The Court went on to hold that the subjective intent of the narcotics detectives in initiating contact with the defendant does not invalidate a search otherwise justifiable under the plain view exception so long as the detectives had probable cause to believe that a traffic offense had occurred justifying the stop.

The "discussed above" comment, which could be read as a reservation of pretextual inventory and administrative searches from the rule announced in *Whren,* is somewhat confusing. However, *Bannister* was not a search following a pretextual stop, nor was it an inventory or administrative search. Both *Bertine* and *Wells* were inventory searches, but not searches following a pretextual stop. In *Wells,* the evidence was discovered in a locked suitcase in the trunk of the vehicle during an inventory search following an arrest for driving under the influence of alcohol and was suppressed because there was no department policy permitting the opening of closed containers during an inventory search. In *Bertine,* where the driver was arrested for driving under the influence, the evidence from an inventory search of the vehicle prior to impoundment was admissible because the search was "in accordance with local police procedures." *Colorado v. Bertine, supra,* 479 U.S. at 369, 107 S.Ct. at 740.

Both *Wells* and *Bertine* are consistent with *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). In that case, the arrest was not pretextual, and the evidence seized from an inventory search of a fanny pack by the jailer prior to incarcerating the defendant was admissible because, as the Court stated: "[W]e hold that it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Illinois v. Lafayette, supra,* 462 U.S. at 648, 103 S.Ct. at 2611.

■ Hence, we conclude that the reservation of inventory searches in *Whren* is not premised on the nature or purpose of the stop or the subjective intent of the officer in making the stop. Rather, the validity of inventory searches turns on the scope of the law enforcement agency's policies, rules, or procedures governing inventory searches prior to the impoundment of property. The Fourth Amendment concern that inventory searches not be used as a "ruse" to search in the absence of probable cause or reasonable suspicion is, therefore, satisfied when the inventory search following a lawful stop and prior to impoundment of the vehicle or property is conducted in accordance with existing agency policies that are consistently applied. *See Florida v. Wells, supra* (absence of policy governing inventory searches invalidates the search).

■ Here, defendant does not dispute that the inventory search was conducted in accordance with standing policies and procedures of the Fort Collins Police Department. Therefore, the evidence discovered during the inventory search in preparation for impounding defendant's vehicle was admissible despite the fact that the subjective intent of the traffic officer in contacting and ultimately arresting defendant was not to enforce the traffic laws but to contrive a basis for searching the vehicle.

## C.

We also conclude that the trial court was correct in refusing to suppress the statements defendant made to the officers at the police station following his arrest.

■ Under *Miranda v. Arizona, supra,* a defendant's statements made to police during custodial interrogation are inadmissible as evidence in a criminal case unless the defendant was advised of certain constitutional rights and waived those rights. *People v. Johnson,* 30 P.3d 718 (Colo.App.2000). Once a criminal suspect in custody invokes his or her right to an attorney, all interrogation in the absence of counsel must cease. *People v. Gonzales,* 987 P.2d 239 (Colo.1999).

■ For purposes of the *Miranda* analysis, interrogation has not been limited to direct questioning, but includes its functional equivalent. *People v. Rivas*, 13 P.3d 315 (Colo.2000). Thus, "interrogation" refers not only to express questioning by a law enforcement officer, but also to "any words or actions on the part of the officer that the officer 'should know are reasonably likely to elicit an incriminating response from the suspect.'" *People v. Trujillo*, 784 P.2d 788, 790 (Colo.1990)(quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980)).

■ In determining whether a person has been subjected to custodial interrogation, courts must consider the totality of circumstances surrounding the encounter. *People v. Rivas, supra.* It is well settled that confessions remain a proper element of law enforcement, and volunteered statements are not barred by the Fifth Amendment. *See Rhode Island v. Innis, supra; People v. Gonzales, supra.* Thus, interrogation under *Miranda* must "reflect a measure of compulsion above and beyond that inherent in custody itself." *People v. Rivas, supra*, 13 P.3d at 319. Practices that have been identified as the functional equivalents of interrogation have generally employed compelling influences or psychological ploys in tandem with police custody to obtain confessions. *People v. Rivas, supra.*

■ A suspect's inculpatory statement is not to be considered the product of custodial interrogation merely because it is made after he or she has been advised of the charges against him or her. Moreover, an officer's direct response to a question initiated by a suspect generally does not constitute interrogation, even though the suspect is in custody and has already invoked his or her right to counsel. *People v. Rivas, supra.*

■ Whether a statement is voluntary depends on the totality of the circumstances, which must demonstrate that the accused's statement is the product of his or her free and rational choice. The ultimate question is whether the police compelled the defendant to make a statement. *People v. Baird*, 66 P.3d 183 (Colo.App.2002).

In issuing its findings at the suppression hearing, the trial court determined that defendant had been properly advised, was well aware of these rights when he voluntarily engaged the arresting officer in conversation, and was not subjected to any custodial interrogation by the Task Force detective prior to offering additional volunteered statements.

■ Upon review of the record, we agree with the trial court that defendant's statements at issue here were made knowingly and voluntarily and were not the product of custodial interrogation. In our view, nothing in the record indicates that the officers in this instance subjected defendant to any coercive techniques, compelling influences, or psychological ploys designed to elicit incriminating responses. Defendant, after being advised and on his own initiative, engaged the advising officer in a conversation in which he referred to his drug activities. Then, after the Task Force detective advised defendant of the charges against him, defendant pointed to the collected evidence and referred to it as his own.

"The Fifth Amendment protects defendants from improper forms of police interrogation, not from their own impulses to speak." *People v. Gonzales, supra*, 987 P.2d at 243. Here, we perceive none of the improper conduct that *Miranda* was designed to remedy. Accordingly, we find no error.

## II.

Defendant contends that the trial court erred in finding him to be a habitual criminal. We disagree, but remand for further proceedings concerning the proportionality of defendant's sentence.

## A.

Defendant first asserts that the trial court erred in making a habitual criminal finding when two of defendant's three prior felony convictions were for driving after revocation of his driving privilege as a habitual traffic offender in violation of § 42-2-206, C.R.S. 2004.

When defendant committed these two offenses in March and December 1995 and the

convictions were entered in May 1996, driving after revocation as a habitual traffic offender was a class six felony. However, the General Assembly subsequently reclassified the offense as a class one misdemeanor. *See* Colo. Sess. Laws 1999, ch. 215, § 42–2–206 at 796.

Defendant argues that the term "felony" should be narrowly construed such that the two prior convictions for driving under habitual traffic offender revocation are not considered "felonies" as contemplated by the habitual criminal statute. Moreover, defendant argues that the fact that he has never been incarcerated for these offenses, but instead served two short work-release sentences, further confirms the inapplicability of the offenses to the habitual sentencing scheme.

In response, the People argue that defendant did not properly preserve this issue at the trial level, and thus, it is not reviewable on appeal. We note, however, that both in a "Demand for Abbreviated Proportionality Review" filed before his sentencing hearing and at the sentencing hearing itself, defendant specifically argued that his statutorily-prescribed sixty-four year sentence was grossly disproportionate under the Eighth Amendment because it was based in part on two convictions for a felony offense that had been subsequently reduced to a misdemeanor by the legislature. Thus, although defendant's argument on appeal differs in form somewhat from that presented to the trial court, we conclude that defendant has properly preserved the substance of his claim of error for appeal, and we address the merits.

■ We conclude that the trial court properly applied defendant's two prior convictions for driving under habitual traffic offender revocation at the habitual criminal adjudication. As a division of this court has stated:

> A defendant is not entitled to the retroactive benefit of amendatory legislation if the General Assembly has not clearly indicated its intent to require such retroactive application. Rather, if the General Assembly states that amendatory legislation "shall apply to offenses committed on or after" the effective date, courts must give effect to that language and may not apply the amendment to offenses committed before the effective date.

*People v. Shipley,* 22 P.3d 564, 567 (Colo. App.2001), *rev'd on other grounds,* 45 P.3d 1277 (Colo.2002).

Here, the General Assembly specified that the amendment to § 42–2–206 reclassifying the offense as a misdemeanor "shall take effect July 1, 1999, and shall apply to offenses committed on or after said date." Colo. Sess. Laws 1999, ch. 215 at 796, 800. Thus, the General Assembly did not mandate that the amended § 42–2–206 should have a retroactive effect for offenses committed prior to July 1, 1999. Indeed, the contrary is true. When the language of a statute is clear, we must give the statute effect as written. *People v. Macias,* 631 P.2d 584 (Colo.1981). Accordingly, defendant's claim must fail. *See* § 2–4–202, C.R.S.2004 ("A statute is presumed to be prospective in its operation."); *People v. Shipley, supra; see also People v. McCoy,* 764 P.2d 1171 (Colo. 1988); *People v. Macias, supra; People v. Lake,* 195 Colo. 454, 580 P.2d 788 (1978); *People v. Kingsolver,* 897 P.2d 878 (Colo.App. 1995).

In so concluding, we note that other jurisdictions have consistently held that a sentencing court may properly utilize a defendant's prior conviction of a crime that was classified as a felony when it was committed to support that defendant's conviction as a habitual offender even though the prior felony offense was later reclassified as a misdemeanor. *See Wells v. State,* 687 P.2d 346 (Alaska Ct.App.1984); *Ross v. State,* 274 Ind. 588, 413 N.E.2d 252 (1980); *People v. Odendahl,* 200 Mich.App. 539, 505 N.W.2d 16 (1993); *State v. Darrah,* 76 N.M. 671, 417 P.2d 805 (1966); *People v. Butler,* 92 A.D.2d 1071, 461 N.Y.S.2d 913 (N.Y.App.Div.1983); *Ortiz v. State,* 626 S.W.2d 586 (Tex.App. 1981); *State v. Ross,* 30 Wash.App. 324, 634 P.2d 887 (1981).

*People v. Nees,* 200 Colo. 392, 615 P.2d 690 (1980), and *Smalley v. People,* 134 Colo. 360, 304 P.2d 902 (1956), which are relied on by defendant, are not persuasive. In *Smalley,* our supreme court overturned a juvenile defendant's life sentence under the habitual

criminal statute because one of the defendant's prior felonies did not fit the specific definition of "felony" as provided in the Colorado Constitution. *See* Colo. Const. art. XVIII, § 4 (defining a felony as "any criminal offense punishable by death or imprisonment in the penitentiary, and none other"). Because the defendant's sentence to a juvenile reformatory did not fall under the constitutional definition of a felony, the prior conviction supporting his habitual offender status did not "suffice for a felony conviction." *Smalley v. People, supra,* 134 Colo. at 363, 304 P.2d at 904.

In *Nees,* the supreme court reversed the defendant's conviction and sentence as a habitual criminal because the trial court had utilized prior convictions to enhance the defendant's sentence even though the prior offenses had been committed *after* the commission of the subject offense. "[T]he habitual criminal statute shall be narrowly construed in favor of the accused," the supreme court stated, and "the policy of the habitual criminal statute is to punish repeat offenders." *People v. Nees, supra,* 200 Colo. at 396, 615 P.2d at 693.

Because the *Nees* trial court had used prior convictions that were, in fact, committed after the commission of the underlying offense, the defendant did not have the opportunity to be put "on notice that future conduct of the same kind [would] result in more severe penalties." *People v. Nees, supra,* 200 Colo. at 396, 615 P.2d at 693. Thus, the purpose of the habitual criminal statute had been undermined, and the use of the prior convictions was improper.

We do not perceive the same need to "narrowly construe" the definition of felony under the facts presented here. Because defendant was found by the trial court to have committed three other felonies prior to the commission of the charged offenses, the court properly sentenced him under the habitual criminal statute. *See* § 18–1.3–801(2).

### B.

Defendant also argues that the trial court erred when it failed to conduct an extended proportionality review after it held an abbreviated review and found an inference of gross disproportionality in his prescribed sixty-four year sentence. We agree that an extended review is warranted in this instance.

▮▮▮▮ Sentencing is a discretionary decision that should not be overturned absent an abuse of discretion. However, whether a sentence is constitutionally proportionate is a question of law. *People v. Cruse, supra.* On appeal, proportionality determinations are reviewed de novo. *People v. Gaskins,* 923 P.2d 292 (Colo.App.1996).

In *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), Justice Scalia, writing for the plurality, concluded that there was no right to a proportionality review except for a death penalty case. Justice Kennedy, concurring in the result, concluded that proportionality review should be extended to other sentences, even a sentence to a term of years as the Court had previously recognized. In summarizing his analysis, Justice Kennedy stated:

> All of these principles—the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors—inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime. [*Solem v. Helm,* 463 U.S. 277, 288, 303, 103 S.Ct. 3001, 3008, 3016, 77 L.Ed.2d 637 (1983)]. See also [*Weems v. United States,* 217 U.S. 349, 371, 30 S.Ct. 544, 550, 54 L.Ed. 793 (1910)](Eighth Amendment prohibits "greatly disproportioned" sentences); [*Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977)] (Eighth Amendment prohibits "grossly disproportionate" sentences); [*Rummel v. Estelle,* 445 U.S. 263, 271, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980)](same).

*Harmelin v. Michigan, supra,* 501 U.S. at 1001, 111 S.Ct. at 2705 (Kennedy, J., concurring).

In *Ewing v. California,* 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003), Justice O'Connor, writing for a plurality of the

Court, used the Kennedy formulation to affirm a life sentence imposed on a recidivist defendant pursuant to the "three strikes you are out" law against an Eighth Amendment challenge. *See also Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)(same).

Justice Kennedy's formulation is widely recognized as the controlling opinion in *Harmelin*, and it is the formulation used in Colorado. *See Close v. People*, 48 P.3d 528 (Colo.2002)(crime of violence sentence to a term of years is not disproportionate).

▮ When conducting an abbreviated proportionality review, a court must scrutinize all the offenses in question to determine whether in combination they are so lacking in gravity or seriousness as to suggest the habitual criminal sentence is grossly disproportionate. *People v. Deroulet*, 48 P.3d 520 (Colo.2002); *People v. McNeely*, 68 P.3d 540 (Colo.App.2002).

▮ A court determines whether a crime is grave or serious "by considering the harm caused or threatened to the victim or to society and the culpability of the offender." *People v. Deroulet, supra*, 48 P.3d at 524; *People v. Martinez*, 83 P.3d 1174 (Colo.App. 2003). Our supreme court has deemed certain crimes to be per se grave and serious for purposes of proportionality review. *See People v. McNeely, supra*. "Specifically, the crimes of aggravated robbery, robbery, burglary, accessory to first-degree murder, and narcotic-related crimes are all 'grave and serious' for the purposes of proportionality review." *People v. Deroulet, supra*, 48 P.3d at 524.

▮ "In almost every case, 'the abbreviated proportionality review will result in a finding that the sentence is not constitutionally disproportionate, thereby preserving the primacy of the General Assembly in crafting sentencing schemes.'" *People v. Martinez, supra*, 83 P.3d at 1180 (quoting *People v. Deroulet, supra*, 48 P.3d at 526). Only when the abbreviated proportionality review gives rise to an inference of gross disproportionality must a reviewing court conduct a further extended proportionality review. This extended review involves "a comparison of the sentences imposed on other criminals who commit the same crime in the same jurisdiction and a comparison of the sentences imposed for commission of the same crime in other jurisdictions." *People v. Deroulet, supra*, 48 P.3d at 524.

Here, as a convicted habitual criminal under § 18–1.3–801(2), defendant was subject to a sentence four times the maximum of the presumptive range for his class three felony offense. Because defendant's underlying offense was listed as an extraordinary risk crime under § 18–1.3–401(10)(a)–(b), C.R.S. 2004, his maximum sentence in the presumptive range was increased from twelve to sixteen years. *See* § 18–1.3–401(1)(a)(V)(A), C.R.S.2004. Thus, under the habitual criminal statute, defendant faced a prescribed sentence of sixty-four years imprisonment.

At defendant's request, the trial court conducted an abbreviated proportionality review during the sentencing hearing. In accordance with prior decisions of our supreme court, *see People v. Deroulet, supra*, the court found that possession of a schedule II controlled substance is a grave and serious offense.

The court also found that criminal trespass, the third offense of which defendant had been previously convicted, was grave and serious. Finally, the court reasoned that, although the two driving after revocation offenses were not particularly grave and serious crimes, they both included "aggravating factors" which increased their relative seriousness, including the facts that defendant committed them only nine months apart and was on probation for previous violations of the law when they were committed.

After outlining the seriousness of the various offenses, however, the court then stated that it had a "slight concern" about proportionality based on the driving offenses. Because the court found that defendant's driving offenses had occurred only nine months apart and the "circumstances" had not changed appreciably between the two offenses, it concluded that there was "some reason to grant some abbreviated proportionality," and it therefore reduced defendant's sentence by nine years.

However, the trial court never concluded, explicitly or implicitly, that defendant's sentence gives rise to an inference of gross disproportionality. Thus, the court did not make the requisite findings necessary to compel a further extended proportionality review. *See People v. Deroulet, supra.* Upon our own review, we conclude that defendant's sentence gives rise to an inference of gross disproportionality, and, accordingly, we must remand to the trial court for an extended proportionality review. *See People v. Deroulet, supra.*

■ In our view, defendant's two driving offenses do not amount to grave and serious crimes. While we recognize that the state has a valid interest in preventing drivers with revoked licenses from utilizing the state's highways and thoroughfares, we nevertheless conclude that, on its own, an offense under § 42-2-206 is essentially a violation of an administrative order. In the absence of other aggravating factors not mentioned by the trial court that would implicate the direct safety of the public, defendant's two driving offenses cannot be understood as "grave and serious crimes" for purposes of proportionality review.

Here, the record offers scant information on the facts and circumstances underlying the two driving offenses. The information filed by the prosecution relating to the March 1995 offense includes one count alleging careless driving. However, we note that that count was later dismissed. From a police affidavit relating to the December 1995 offense that was appended to defendant's demand for a proportionality review, it appears that, in that instance, defendant was pulled over by the police for a speeding violation. No other aggravating factors implicating the public's safety are evident from the factual record pertaining to the two offenses.

Without additional evidence indicating a greater degree of danger to the public arising as a result of defendant's actions, the two driving offenses cannot, in our view, be considered "grave and serious" offenses. They are not crimes of violence, there were no specific victims involved, and defendant only served two short work-release sentences following his two guilty pleas.

■ In addition, the legislative history of § 42-2-206 is pertinent. We have already concluded that the legislature's reclassifying the offense from a felony to a misdemeanor does not prohibit the use of defendant's two offenses as prior felony convictions under the habitual criminal sentencing statute. However, we also conclude that it is appropriate to consider such a legislative amendment in assessing the relative gravity and seriousness of the offense. As a division of this court has stated, "the General Assembly's current evaluation of the seriousness of the offense at issue is a factor that can be considered in determining whether [a] defendant's sentence is grossly disproportionate." *People v. Gaskins, supra,* 923 P.2d at 296. Here, the General Assembly reduced the offense from a felony to a misdemeanor. In our view, this indicates the General Assembly's conclusion that the offense is not grave and serious.

While we recognize that great deference is normally to be accorded to the legislature in crafting sentencing schemes, *see People v. Deroulet, supra,* we conclude that the unique circumstances in this case present one of those rare occasions when an extended review of the proportionality of defendant's sentence is appropriate. As our supreme court has stated: "The danger of any habitual criminal statute is that its formulaic and formalistic nature creates a possibility that a sentence imposed will be unconstitutionally disproportionate. A statutory scheme cannot guarantee a sentence that is constitutionally proportionate to a particular defendant convicted of a particular crime under particular circumstances." *People v. Deroulet, supra,* 48 P.3d at 526.

In making our determination, we are cognizant that the weight of authority in this state rejects similar proportionality challenges to habitual criminal sentences. However, we also note that in those cases, the courts determined that most, if not all, of the defendant's triggering and prior felony convictions were for grave and serious crimes. *See People v. Mershon,* 874 P.2d 1025 (Colo.1994)(upholding life sentence on basis that all of defendant's triggering and prior

crimes were serious); *People v. Allen*, 111 P.3d 518 (Colo.App.2004)(finding no inference of disproportionality in twenty-four year sentence because both of defendant's triggering offenses and all four of his prior felonies were serious); *People v. Martinez, supra* (forty-eight year sentence affirmed; only one of defendant's five convictions considered not serious); *People v. Strean*, 74 P.3d 387 (Colo.App.2002)(sentence of forty-eight years to life under habitual sex offender statute upheld as court found defendant's offenses as sexual offender were grave and serious); *People v. McNeely, supra* (affirming forty-eight year sentence because defendant's triggering offense and three of his four prior offenses were considered serious); *see also Lockyer v. Andrade, supra* (California Court of Appeals decision upholding defendant's two consecutive twenty-five years to life sentences under state's three strikes law proper application of federal law where at least two of defendant's three felonies deemed serious or violent); *Ewing v. California, supra* (defendant's sentence of twenty-five years to life under three strikes law not constitutionally disproportionate where all four of his prior strikes were serious felonies).

■ Given that our state's jurisprudence requires that we assess *all* of a defendant's offenses together in determining the proportionality of a sentence, *see People v. Deroulet, supra*, and recognizing that two, and arguably all three, of defendant's prior felony convictions did not involve grave and serious crimes, we conclude that the sentence mandated by the habitual criminal statute in this instance, sixty-four years, gives rise to an inference of gross disproportionality when compared to the predicate offense and the prior convictions. Therefore, an extended review of the sentence is necessary, and, if the sentence is considered disproportionate after that review, resentencing will be necessary as well. *See People v. Valdez*, 56 P.3d 1148 (Colo.App.2002).

Finally, both parties agree that the mittimus should be amended to reflect that defendant was convicted of the triggering offense by a jury and not by the court.

The judgment of conviction is affirmed, the sentence is vacated, and the case is remanded to the trial court for correction of the mittimus, an extended proportionality review, and, if necessary, resentencing.

Judge WEBB and Judge GRAHAM concur.